[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-15810
Non-Argument Calendar

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**October 26, 2006**
**THOMAS K. KAHN**
**CLERK**

D.C. Docket No. 05-60106-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LESLIE PERKINS,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(October 26, 2006)**

Before TJOFLAT, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Leslie Perkins appeals her convictions and 210-month sentences for

conspiracy to import cocaine, in violation of 21 U.S.C. § 963, and conspiracy to

possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846. She challenges both her conviction and her sentence on multiple grounds. Having considered her arguments in light of the law and the record, we affirm.

## I. Sufficiency of the Evidence

Perkins argues that the evidence was insufficient to support a conviction on the conspiracy counts. First, she contends that, if there was any agreement, it was an agreement to smuggle a person, rather than drugs, into the United States. She also argues that her mere knowledge that others in the Bahamas had cocaine was insufficient to show her active participation in an agreement to import. Finally, she argues that there was no conspiracy because the purported "cocaine" with which she was found upon her arrest was actually fake.

We review de novo challenges to the sufficiency of the evidence, viewing the evidence in the light most favorable to the government. United States v. Futrell, 209 F.3d 1286, 1288 (11th Cir. 2000). To support a conviction for conspiracy to import cocaine, "the government must prove beyond a reasonable doubt that there existed an agreement between two or more persons to import narcotics into the United States and that the defendant knowingly and voluntarily participated in that agreement." United States v. Arbane, 446 F.3d 1223, 1228 (11th Cir. 2006).

2

In the instant case, DEA Agent Randy Matschner testified at trial that the investigation of Leslie Perkins and her husband, Joel Perkins, began when he was advised that Joel Perkins was looking for a boat to import cocaine from Freeport to the United States.

Agent Matschner testified that he contacted Joel Perkins and they arranged a deal for March 2005 whereby Matschner would pick 20 kilos of cocaine up from Joel Perkins and do a "turn around trip"[1] to pick up another 40 kilos. Subsequently, Matschner met with both Leslie and Joel Perkins in Deerfield Beach, Florida and testified that Leslie Perkins participated in the conversation regarding the planned trip to pick up the cocaine, ultimately suggesting that she would be on the boat when Matschner met it to transfer the cocaine. Matschner testified that Joel and Leslie Perkins again later contacted him by three-way telephone call to discuss Leslie Perkins boarding the vessel in the Bahamas. Joel Perkins stated a desire to have one of his people on the boat to be responsible for the cocaine, and Leslie Perkins agreed to board the boat in the Bahamas and return to the United States with the cocaine. Agent Matschner testified that he advised her to pack the cocaine in 20 kilo amounts, packaged on ice and hidden from view

---

[1] Matschner stated that a "turn around" was a return trip, for more cocaine, immediately after unloading the first shipment.

by frozen seafood.

Agent Matschner, along with other agents, proceeded to leave Fort Lauderdale, Florida, for the Bahamas. According to Matschner, Joel Perkins contacted him, via cell phone, while he was on the boat and told the Agent that Leslie Perkins was waiting for him in the Bahamas. Matschner then made telephonic contact with Leslie Perkins and gave her the coordinates of his boat's location. Matschner stated that Leslie Perkins told him she would be arriving to meet his ship in a small white Boston Whaler.

According to Matschner, when he saw the Boston Whaler approaching, he observed three persons on board the boat: (1) Marvin Johnson, the supplier of the drugs, (2) Leslie Perkins, and (3) an unidentified Bahamian male. Matschner testified that both Johnson and the other man had pistols tucked into their waistbands. Matschner stated that, as the Boston Whaler was alongside the undercover boat, he asked Leslie Perkins if the dope was in the cooler, and Leslie Perkins responded "yes." Matschner testified that after he helped Leslie Perkins onto the boat, Johnson handed him the cooler. Matschner asked Johnson if the dope was in the cooler, and Johnson responded in the affirmative.[2] At that point,

---

[2]Agent Coddington corroborated Agent Matchner's testimony. Agent Coddington testified that he was on board the undercover vessel for security purposes, concealed in the cabin area of the boat. According to Coddington, he observed a small boat approach their boat,

4

Leslie Perkins was placed in custody. According to Matschner, when he opened the cooler, it was packed the way he had advised Leslie Perkins to pack it, with ice and 20-kilo packages, except that there was no fish or lobster.

When Matschner submitted the packages for analysis by the DEA lab, the analysis revealed that the cocaine was fake and that the packages he retrieved contained no controlled substance. A search of Leslie and Joel Perkins's home, however, revealed cocaine. Agent Coddington, who led the search of the home, testified that, in the master bedroom of the Perkins home, he found a shoe box containing a large amount of U.S. currency and a kilo-sized cocaine brick. Coddington testified that the cocaine brick was tested and was a high quality of cocaine. Coddington testified that a green backpack found in the house contained fake dope and a large digital scale was also found in the backpack. Coddington testified that the agents conducting the search of the Perkins home also found a gray safe in the master closet which contained money and a a Ziploc bag containing 427.8 grams of cocaine.

Based on the above, we conclude that sufficient evidence was presented from which a jury could have found that Leslie Perkins was part of the conspiracy

containing two black males and Leslie Perkins. Coddington stated that he observed pistols in the waistbands of the two men. Coddington testified that Matschner led Leslie Perkins into the cabin, and Coddington detained her.

to import cocaine   Furthermore, the fact that the cocaine loaded onto the undercover boat was fake is not inconsistent with the conclusion that the evidence was sufficient to support a conspiracy conviction. Although our predecessor Court, in United States v. Murray, 527 F.2d 401 (5th Cir. 1976), reversed a conviction where the defendant sold fake dope, that case is inapplicable here.  In Murray, the defendant not only sold fake dope, but his actions were consistent with someone who intended only to sell a fake substance.  Murray, 527 F.2d at 409.  In this case, there was sufficient evidence by which the jury could have inferred that the conspirators' behavior was consistent with an intention to import an actual illegal substance.  For example, there was much discussion about a turn around trip, on which Matschner would pick up 40 kilograms of cocaine, and the jury could have reasonably inferred that the first trip was intended as a test run. Furthermore, the jury could infer that the conspirators' behavior was inconsistent with an intention only to import a fake substance.  Actual money was exchanged, and, since the drugs belonged to Johnson, the conspirators had nothing to gain from importing a fake substance.  Additionally, there was no evidence that Leslie Perkins knew that the cocaine was fake, and the jury could infer that she did not know.  In a recorded jailhouse telephone conversations between Leslie Perkins and Johnson, Johnson referred to **his** decision to put fake drugs on the boat.  In

6

this way, the jury reasonably could interpret the facts of this case to be distinguishable from those in <u>Murray</u>. Thus, "a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." <u>United States v. Baker</u>, 432 F.3d 1189, 1231 (11th Cir. 2005).

## II. Evidentiary Issues

Perkins argues that the aggregation of alleged errors in the district court's evidentiary rulings mandates a new trial.[3] Perkins first argues that she was prejudiced by the playing of the tape of a jailhouse telephone conversation with Johnson, an alleged co-conspirator, in which she made reference to her decision to remain silent and not talk to law enforcement. She argues that the district court failed to properly instruct the jury regarding her right to remain silent. <u>See</u> <u>Doyle</u>

---

[3] We review a district court's evidentiary rulings for an abuse of discretion:

An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. We review preserved evidentiary objections for harmless error. However, when a party raises a claim of evidentiary error for the first time on appeal, we review it for plain error only. Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Further, we must review the prejudicial effect of all evidentiary errors, evaluated under both preserved and plain error standards, in the aggregate. We will therefore reverse if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless.

<u>Baker</u>, 432 F.3d at 1202-03 (internal citations omitted).

v. Ohio, 426 U.S. 610, 619 (1976) ("[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.").

In United States v. Miller, 255 F.3d 1282, 1285-86 (11th Cir. 2001), we held that:

> [a] [Doyle] violation is harmless if the error had no substantial and injurious effect or influence in determining the jury's verdict. For example, we have repeatedly held harmless a prosecutor's single reference to the defendant's post-Miranda silence if it occurs during a trial at which the government's evidence was otherwise overwhelming. This is especially so where the prosecutor makes no further attempt to 'highlight' the defendant's exercise of Miranda rights either in questioning other witnesses or during closing argument.

Miller, 255 F.3d at 1285-86 (internal citations and quotation marks omitted).

In the instant case, not only were the references to Perkins's silence not highlighted, but in addition, the district court gave a curative instruction and redacted the references from the transcript before sending it to the jury room. Under these circumstances, we cannot say that any error had a "substantial and injurious effect or influence in determining the jury's verdict," and thus, any error was harmless. Id.

Perkins next argues that she was prejudiced by Agent Matschner's "blurting his improper comments and opinions about" Leslie Perkins being in the Bahamas,

8

having contacts in the Bahamas, and calling telephone numbers in the Bahamas. She argues that the jury was left with the conclusion that the agents had information not available to the jury, giving improper weight to the government's case. She argues that the district court erred in admitting evidence of her trips and telephone calls to the Bahamas the year prior to her arrest.

Perkins concedes on appeal that her objections to the challenged "improper" testimony were sustained. Furthermore, evidence of Leslie Perkins's frequent travel to the Bahamas during the course of the investigation, together with telephone records showing contact between her phone and those of Joel Perkins and Johnson, while perhaps not proof of participation in the conspiracy, are consistent with and probative of such participation.[4] The purpose of some or all of Leslie Perkins's travel to the Bahamas may in fact have been innocuous. However, the government was required to show that Leslie Perkins had contact

---

[4] As we have explained:

> Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Fed.R.Evid. 401. In a criminal trial, issues of consequence generally consist of 'the elements of the offenses charged and the relevant defenses (if any) raised to defeat criminal liability.' United States v. Hall, 653 F.2d 1002, 1005 (5th Cir.1981). '[R]elevant evidence is admissible,' but 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.' Fed.R.Evid. 402 and 403.

United States v. Williams, 51 F.3d 1004, 1010 (11th Cir. 1995), abrogated on other grounds, Jones v. U.S., 526 U.S. 227, 231-32 (1999).

with the drug sources in the Bahamas, including Johnson, and the jury could interpret this evidence as probative of that fact.

Perkins next argues that she was prejudiced by Agent Coddington referring to her and Joel Perkins's family home as "her" home and the bedroom as "her" bedroom. Perkins concedes that all timely objections to such references were sustained, but again argues that the jury was left with the conclusion that the agents had information not available to the jury, giving improper weight to the government's case. Agent Matschner testified, without objection, that: (1) Leslie Perkins gave him her address: 3705 Northwest 82nd Ave., Coral Springs, Florida; (2) the residence was in fact that of Leslie Perkins; (3) he had discovered that Joel Perkins lived at that same address; (4) a search warrant was obtained for the Perkins residence; and (5) that the warrant was executed on March 7 with Agent Ron Coddington the primary agent in charge. Agent Coddington testified, without objection, that the search warrant was executed at the house at 3705 Northwest 82nd Ave., Coral Springs, Florida. It was not prejudicial to refer to the house as Leslie Perkins's house, and the bedroom in the house as Leslie Perkins's bedroom, when it was properly established that the house belonged to her and her husband.

Perkins next argues that her objection was erroneously overruled as to Agent Matschner's statement that his life might be in danger, which was why he

gave Perkins a fake address. He testified that a false address was necessary "so nobody's life would be in jeopardy." We see no prejudice resulting from the admission of this statement, as the jury could reasonably infer that the use of a real address, in an undercover operation, as a general rule and without any specific reference to the individuals in the instant case, poses an unreasonable risk. The jury could similarly infer that the use of a fake address in such operations is prudent, again, with no necessary reflection on the individuals in the instant case. We do not find reversible error.

Finally, Perkins argues that the district court erred by allowing seven tapes of her jailhouse conversations with Johnson to be played, and erred further by allowing the transcripts to be taken to the jury room. She contends that a government chart outlining her telephone calls was improperly admitted and allowed into the jury room during deliberations. Perkins does not explain how or why these evidentiary decisions were prejudicial or improper. In Davis v. Hill Engineering, Inc., 549 F.2d 314, 324 (5th Cir. 1977), overruled on other grounds, Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 339 (5th Cir. 1997), our predecessor held that, where an appellant did not specify on appeal how a district court's decision was in error, the Court had no basis on which to consider the appeal. Davis, 549 F.2d at 324. In the instant case, Leslie Perkins argues that

"[t]he [sheer] volume of these conversations improperly became the focus of the trial and prejudice overcame any possible probative value," but she gives no explanation as to what was on the tapes, why it was improper for them to become the focus of the trial, or how they were prejudicial. With no substantive arguments to consider on these points, we do not address them.

### III. Prosecutorial Misconduct

Perkins argues that the prosecutor engaged in misconduct by: (1) attempting to exclude minority jurors, (2) engaging in a variety of personal attacks during the trial, (3) failing to redact a tape, and (4) failing to call Joel Perkins as a witness after suggesting that it would. In assessing claims of prosecutorial misconduct, we apply a two-part test:

> the challenged statements must be improper, and must have prejudicially affected the defendant's substantial rights. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome would be different. Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record.

United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995).

With respect to jury selection, Perkins argues that the prosecutor engaged in misconduct by striking black jurors. However, Perkins does not cite Batson v. Kentucky, 476 U.S. 79 (1986), or any other case to support her argument. Further,

12

she gives no indication, and the transcript of jury selection gives no indication, of how many blacks were in the venire, how many, if any, went unchallenged by the prosecutor, and how many were ultimately allowed on the jury. When a defendant fails to offer argument on an issue, it is abandoned. United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998). In the absence of supporting facts, together with the absence of any law, her argument about jury selection must fail.

Perkins's second assertion of prosecutorial misconduct regards alleged personal attacks and criticism of defense counsel made by the prosecutor during trial. Perkins contends that the prosecutor improperly: (1) referred to Perkins as a "drug dealer" when addressing the jury; (2) implied that there was information from Brian, the informant who first supplied Agent Matschner with the tip about Joel Perkins; (3) implied additional information by asking witnesses to explain or give opinions about tape recordings; and (4) gave her personal opinion on the validity of the defense presented by stating that "she never heard of a withdrawal defense after a subject was arrested." Perkins argues that the prosecutor's references to her as a "drug dealer" in her opening statement and closing argument were improper under our precedent in United States v. Blakey, 14 F.3d 1557, 1560 (11th Cir. 1994). That case involved a statement that went outside the evidence and that the government conceded at trial was not true. Blakey, 14 F.3d at 1560.

13

In the instant case, the prosecutor's statement was consistent with the evidence. Furthermore, given the volume of evidence against her, Perkins has not shown that there is a reasonable probability that, but for the challenged conduct of the prosecutor, the outcome of the trial would have been different. See Hall, 47 F.3d at 1098.

Third, Perkins argues that the prosecutor failed to properly redact the tape that included Leslie Perkins's references to remaining silent and commented on Leslie Perkins's silence. She argues that the prosecutor commented during closing argument that "the jury did not hear the Appellant deny possession or ownership of drugs." As discussed above, the failure to redact the tape of the jailhouse conversation was harmless error because it "had no substantial and injurious effect or influence in determining the jury's verdict." See Miller, 255 F.3d at 1285-86. Thus, it similarly did not result in a reasonable probability that, but for the challenged conduct of the prosecutor, the outcome of the trial would have been different. See Hall, 47 F.3d at 1098. As for the reference to Perkins's failure to deny possession of drugs, this was a reference to a conversation with Johnson. Thus, Perkins's silence was not with respect to the court or to law enforcement, but with respect to her own co-conspirator. Thus, the reference was not erroneous.

Finally, Perkins argues that the government improperly advised the court

and the defense that it would call Joel Perkins as a witness, and then did not do so, after it had forced the defense to address before the jury the fact that Joel Perkins had pled guilty and was cooperating with the government. Leslie Perkins has failed to show how her being forced to address before the jury the fact that Joel Perkins had pled guilty and was cooperating with the government created a reasonable probability that, but for the challenged conduct of the prosecutor, the outcome of the trial would have been different. See Hall, 47 F.3d at 1098. For these reasons, we find no evidence of prejudicial prosecutorial misconduct.

## IV. Denial of Motion for New Trial

Perkins argues that the verdict was against the weight of the evidence and thus the district court erred in denying her motion for a new trial. We review a district court's denial of a motion for a new trial for abuse of discretion. United States v. Riley, 211 F.3d 1207, 1208, vacated on other grounds, 232 F.3d 844 (11th Cir. 2000). In reviewing a motion for a new trial based on a claim that the verdict is against the great weight of the evidence:

> [i]f the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985) (internal citations

15

and quotation marks omitted).

As discussed above, many of the errors alleged by Leslie Perkins were not errors. Taking Perkins's claims together with the weight of the evidence arguments discussed above, and weighing them against the strength of the government's case, the cumulative effect does not result in a miscarriage of justice, and the district court did not abuse its discretion by denying the motion for a new trial.

## V. Sentencing

Perkins argues that the district court committed two errors in sentencing. First, she contends that the court erred by enhancing her sentence for the presence of Johnson's gun. She argues that the absence of jury finding on this issue violates United States v. Booker, 543 U.S. 220, 244 (2005), and that the enhancement was not properly applied nor factually supported. Second, she argues that the district court clearly erred in finding that no reduction was appropriate for her role in the offense.

"Because [Leslie Perkins] objected to the enhancements to [her] sentence in the district court, we review the sentence [de novo]. We will reverse the district court only if any error was harmful." United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005) (internal citations omitted).

16

With respect to the lack of jury findings as to the firearm enhancement, we find no error. If the district court applies the Guidelines as advisory, nothing in Booker prohibits it from making, under a preponderance-of-the-evidence standard, additional factual findings that go beyond a defendant's admission. United States v. Chau, 426 F.3d 1318, 1323-24 (11th Cir. 2005); United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005). Perkins's constitutional Booker argument thus fails because the district court applied the Guidelines as advisory and was thus permitted to make additional factual findings by a preponderance of the evidence. Chau, 426 F.3d at 1323-24.

With respect to the proper application of the firearm enhancement, § 2D1.1(b)(1) of the United States Sentencing Guidelines provides that, with respect to the instant offense conduct involved in Count 1, conspiracy to import cocaine, "[i]f a dangerous weapon (including a firearm) was possessed," the base offense level is increased by two. U.S.S.G. § 2D1.1(b)(1). We have held that:

> for a § 2D1.1(b)(1) firearms enhancement for co-conspirator possession to be applied to a convicted defendant, the government must prove by a preponderance of the evidence: (1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant.

United States v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999).

17

In the instant case, Agents Matschner and Coddington both testified that Johnson had a gun at the time of the boat-to-boat transfer. Based on the evidence of Johnson being the source of the drugs and the discussions between Agent Matschner, Joel Perkins, Leslie Perkins, and Johnson, the evidence supports the finding that Johnson was a co-conspirator in the conspiracy to import cocaine. Johnson's possession of the gun at the time of the transfer of the cocaine was thus in furtherance of the conspiracy. Because Leslie Perkins fulfilled her role in the conspiracy by boarding the undercover boat for the purpose of being responsible for the drugs, the evidence indicates that she was a member of the conspiracy at the time of Johnson's possession. Finally, because there is a "frequent and overpowering connection between the use of firearms and narcotics traffic," United States v. Cruz, 805 F.2d 1464, 1474 (11th Cir. 1986), and because Leslie Perkins was on the Boston Whaler with Johnson at the time Matschner testified that he saw the gun, the evidence indicates that it was reasonably foreseeable to Perkins that Johnson possessed a gun in furtherance of the conspiracy. Accordingly, the district court did not clearly err in finding, by a preponderance of the evidence, that all four Gallo prongs were met, and thus did not err in applying the two-level enhancement for the presence of Johnson's gun.

Perkins's second argument about sentencing is her conclusory statement

18

that the district court's factual finding that no role reduction was warranted "was not substantiated and in fact constituted clear error." Perkins offers no support and explains no argument in support of this conclusion, thus we need not address it. See Cunningham, 161 F.3d at 1344 (holding that, when a defendant fails to offer argument on an issue, it is abandoned).

Upon review of the pleadings, the sentencing transcript, and upon consideration of the briefs of the parties, we find no reversible error.

**AFFIRMED.**